We are appealing the District of Minnesota's judgment of dismissal on summary judgment dismissing all of my client's claims for Title VII in Minnesota Human Rights Act, race discrimination, retaliation and reprisal, and First Amendment retaliation. For 12 years, my client was an ideal employee of Hennepin Healthcare System, which is the large public hospital in Minneapolis formerly known as Hennepin County Medical Center. I'd like to start today with her race discrimination claim and the McDonnell Douglas prima facie case analysis. My client is a member of a protected class. She's a Filipina woman. She also has black children. As to prong two, as to meeting the employer's legitimate expectations, there can be no dispute that she was a high-performing employee who was chair of a high-performing department. In her 2017 review, she received twos and threes across the board, three being the highest rating, two being meets expectations. That 2017 review, she was the interim chair of the OBGYN department. She went through the process of becoming permanent chair in 2018. In a 2019 provider engagement survey, she received uniformly good feedback. The only perhaps negative feedback really related to the structure of the department and the lack of resources. Nothing about her personally. Prior to May of 2020, not one doctor brought concerns to the vice president of medical affairs, Dr. Hilden, who would be Dr. Castillo's immediate supervisor, about her performance as chair or as a doctor. And yet in 2021, she was demoted from the position of chair. Counsel, I see lots of evidence that she's raised an inference of discrimination, but it seems to be based on her political beliefs, not her race. What inference was raised of discrimination based on race? So here is the case, and I acknowledge that significant context needs to be provided for this. But while discrimination on the basis of political beliefs alone would not give rise to a Title VII claim, when the employer exceeds to the popular view that all members of protected class can only have one set of correct political beliefs, and any deviation from that orthodoxy is evidence of mental illness or a mental break, that is racism. All right. Give me your best Supreme Court or Eighth Circuit case for that proposition. I've never heard it argued. Well, I guess I'm arguing the stereotyping cases, which we cite in our brief, that of this view, the ideology that took hold at HHS in May of 2020. Give me your Supreme Court case that you're relying on. I don't have a Supreme Court case. I'm making a factual argument based on just first principles. Well, let's say it wasn't a factual argument. It was a legal argument. It was a response to a legal question. Well, I say I'm relying on 24-H saying the circumstances giving rise to that inference. And I think the circumstances, you have to set the table with what was happening in May of 2020. Well, you know, the interesting thing about that to me is that in May of 2020, Dr. Gustillo was making no claim that she was being discriminated on the basis of her race and no claim that she was being discriminated against because she wasn't, like, complying with the stereotypes, right? That claim doesn't arise, and nothing that she ever writes to anybody who's a decision maker, nothing she ever conveys to any of her coworkers, nothing that she ever states to any independent investigative authority ever shows up until the EEOC claim. What are we to make of that? Because, you know, ordinarily we look for things in the record that are contemporaneous with the adverse employment, contemporaneous or precedent to the adverse employment action. And at this point, everything that says this kind of conveniently comes after the adverse action has already been determined. And so the suspicion might very well be that everything is now being framed just to present a claim that may survive a motion. Well, I'll say this. One of the things that Dr. Gustillo talks about in the contemporaneous record is she is reading and learning things as she goes here. And so I don't think she personally realized the import of what she described as critical race theory's impact on management and her colleagues' decision, that it was really, at the end of the day, racially motivated because she held views that essentially they didn't regard as possible for a Filipino woman to have. Why is that stereotype out there? My experience has been that most of the Filipinos that I know are quite conservative. I mean, they're religiously conservative. I mean, this whole stereotype that they're somehow liberal Democrats is a new thing to me. I mean, is that a real thing? Does that exist? And what evidence is there that that exists? Well, I'll say the illiberal approach to race issues that took hold at HHS, I suppose, was not rationally based. It is a bit of a theology in the notion that it does, it rejects core tenets of Western liberalism. And it's an anti-conservative theology, right? Certainly. I mean, it's anti-liberal in the broad sense of Western liberalism. It rejects the rule of law. It rejects individual rights. It flattens people into racial avatars for their group. And so when you hold this view, you have to ignore that there may be many conservative Filipinos, because you are saying all people of color are part of a suppressed group that must agree with us on our assertion of how American society is organized. So it is more a theory that's not tied to any national group, as it is just racially, that people of Hispanic and Asian and African American ancestry are more likely to be discriminated against. Correct. I cite to the term BIPOC, which became into popular usage at this time, Black Indigenous Person of Color. Flattens them all into this group. And HHS, much like many of the other institutions in the country, was on board with this program. They cite the elimination of racism as part of their mission. They talk about health equity, meaning HHS itself described itself as a racist institution, because there were disparate outcomes in health between different race groups. They do this in this Nobody Gets a Pass video, where C-level officers are talking about this. Now, Dr. Gastillo makes herself known as a dissenter, saying that HHS is not systemically racist at an executive leadership retreat. She made — she wrote a letter objecting to the instantiation of critical race theory in the fall of 2020. But perhaps more importantly, in her own department, where she was attempting to provide good leadership, being very clear to her colleagues that she was not on board with the new program, and they reacted very poorly to that. Counsel, time slipping away quickly. Could you address the First Amendment retaliation claim and specifically ratification by the board? Yes, Your Honor. So the district court and the briefing only addresses Monell liability here. That — so our premise is that her personal Facebook posts were a trigger or basis for her demotion. I don't think we disagree on the law of Monell liability. What we have here is the bylaws of HHS provide that the initial decision on whether to demote a department chair is to be made by the medical executive committee. The medical executive committee had a 90-page packet full of all the complaints from her colleagues about her speech, her Facebook posts, et cetera, et cetera. The bylaws then say that that decision goes to the board of governors, the final policymaking authority, to ratify that decision. In 30B6 testimony by HHS's authorized representative, that representative testified that the board of governors ratified the MECS decision and the basis for it. Yes. But is there any evidence that the board of governors was ever provided with that 90-page report or that any representations were made by the people who presented it to the board? You know, so, I mean, you know, one could say, yeah, we ratified a decision and the reasons. But if you never knew exactly what the reasons were because the 90-page report's never given to you, that could just be, you know, a stray piece of testimony. Well, except it's a 30B6 deposition, Your Honor. 30B6 is designed to narrow the issue so we don't have to take, you know, 20 depositions. So we used a procedural rule to eliminate an issue. The witness did eliminate that issue for us by saying that the board of governors ratified the decision and the basis therefore. Why should I go to the magistrate judge after I get that testimony and say, gee, judge, I need 20 more depositions and I need to, you know, more time and discovery to do that, when they've already conceded the point? All right. So you have no evidence that that report was ever delivered. You just have their admission by the use of the word ratification? Correct, Your Honor. And the basis for the decision. And the basis, yes. Yes. So in a sense that they had authority to do it, not that they needed to actually go line by line through the MEC packet. Essentially, that issue has been conceded. They are the final policymaking authority and 30B6 testimony, HHS conceded that. So I'd like to turn briefly to pretext. As you get a sense from their brief and also in the trial court, they talk a lot about lack of leadership and also the fact that she was discussing issues about race and COVID. Lack of leadership is a fairly subjective term. And I think if you drill down into this, they're talking about three different things. One is the letter regarding George Floyd, where they concede that HHS had no formal policy guidelines or standards for department-wide letters. Dr. Gastillo, it's undisputed, expressed a willingness to engage in conversation with her colleagues. She thanked employees for ideas. She offered to help with logistics in sending out the idea. This is not an example of someone engaging in poor leadership. It is an example of where the employees didn't like where she came down as objecting to an endorsement of rioting on a letter from a public institution. Similarly, the other issue that was raised was the white coats for Black Lives Matter rally. Dr. Gastillo reasoned that a public institution shouldn't be endorsing a private rally. She also may have had personal issues with the agenda of white coats for black lives. And she did raise the issue that the members of the department appeared there in their white coats, their official HHS coats, and were thanked as members of HHS. And then the third item is, obviously, people were offended by her Facebook page and her personal views. But as a public institution, that cannot form a proper basis. Well, you say that. That's wrong. You don't have any cases to support that. I mean, it sounds right to me as a matter of fairness and whatnot, but it's not Title VII law. So I suppose that private speech wouldn't be — I am blending the First Amendment and Title VII issue a bit there, Judge. But I say, if we're talking about factually a lack of leadership, a public institution — Well, this is your pretext argument. Yes, Your Honor. Why are we sliding back into the First Amendment? Because a public institution has no legitimate basis to discipline a public employee for private speech. If the people under a leader's command vote 25 to 1 that she should no longer be their leader, that's pretty dang relevant. But acting on that pretextual is beyond my pale. I understand, Your Honor. But at some point, if you fall out of favor as a leader — Well, let me challenge that, Your Honor. You get demoted. If it was 1968 and we were talking about a black supervisor and 25 of his white employees voted to oust him because they didn't want to work for a black man, you would agree that's — Okay, you can prove that, but you don't prove that here. Yeah. Doesn't matter that, you know, she asked all of her colleagues to take a pay cut and declined to take one herself? I mean, couldn't that create an uproar in the Department such that you are an untenable leader from that point forward? Isn't that — isn't that old enough to say, not pretext, we just got people who are really offended by her lack of judgment and her idea that we ought to all sacrifice and she's the only person who's exempt from sacrifice? Well, as we detail, I think, in the record below, there's — in OB-GYN departments, there is always tension between the midwives and the doctors. What she does — she doesn't take any kind of a pay cut. Then there's a vote, and a vote doesn't go the way you want it. And then they say, okay, we're not going to have a secret ballot. We're now going to have an open ballot. Couldn't that undermine confidence in your leadership such that the rational 25 could say, whatever that is, we can't have that? I'll say this, Your Honor, I'm not sure the record shows that she didn't also experience the pay cut. But beyond that, when we get to the environmental survey in November of 2020, where people are complaining about her, that issue doesn't come up. They're talking about her Facebook page. They're talking about her discussions on race and COVID. And I guess I'll reserve the rest of my time, Your Honor. Thank you. Good morning. May it please the Court and the Counsel, my name is Katie Lynch. I represent the defendant, Apollee Hennepin Healthcare System, Inc., or HHS. This case is about a physician leader who so lost the trust of her colleagues that 13 of 14 physicians in her department gave her a vote of no confidence. And several physicians, one-third of the treating physicians in the department, said they were going to leave. After a months-long process, the HHS Board of Directors, the final policymakers with respect to this action, voted unanimously to demote her. And I want to jump straight into the Monell discussion, because that's what this case ultimately comes down to. This is at core a First Amendment claim, which means we're talking about Monell. The District Court correctly applied the Monell Doctrine and dismissed the First Amendment claim. Because under Monell, liability attaches only to the constitutional violations of the municipality itself. So it's well established, not only at the U.S. Supreme Court, but in this circuit, repeatedly holding that vicarious liability does not apply. We're not in a situation where we apply respondeat superior. So there's basically a two-step analysis here. First, courts, including this Court, defers to state and local lawmakers to determine who the final policymaker is. So we identify the policymaker, and then we look at the record and say, is there evidence that the policymaker did something that violated someone's constitutional rights? And in this case, that's First Amendment rights. There's no dispute. The HHS Board of Directors is the final policymaker here. So there has to be evidence in order to, for Dr. Costillo to proceed on her claim. There has to be some evidence. Who is it? I'm sorry? Who is the finalist? Yes, the HHS Board of Directors. Oh, okay. That's clear in our statute. It's a Minnesota statute, 383B.907. We cite that in our brief. Counsel, I agree with you, so let me ask you this. Was the basis for MEC's decision to recommend demoting Dr. Costillo different than what was outlined in the memo to the HHS Board? No, Your Honor. Dr. Hilden testified that that memo, this two-page memo, outlined the summary of the Medical Executive Committee's recommendation in the, I believe I'm quoting, the critical points for the bases for recommending her removal. And if you look at this memo Given that when Dr. Hilden testified on behalf of the Board that the Board approved the basis for MEC's recommendation, why couldn't a reasonable jury conclude that the Board approved, that their approval encompassed the reasons included in the memo to the MEC Board? Because there's no evidence of that. To find that the Board, there were 13 He just told me that the reasoning was the same. And then Mr. Hilden testified on behalf of the Board in a 386 deposition that the Board had approved the reasoning for the demotion. Your Honor, if you look at the full context of Dr. Hilden's testimony, he clarified that, yes, we all agree under the bylaws the Board had to approve the MEC's recommendation. And if you look at the full context of his testimony, he said the Board approved the bases that were outlined in his memo. So that's the evidence that we have. No reasonable juror can look at this memo and say, the Board approved something that violated Dr. Costillo's First Amendment rights. It's just not in there. And there's no evidence from any Board member, because no Board members were deposed. There were 13 of them that voted unanimously to approve this vote. There's no testimony from any Board member that they considered any of Dr. Costillo's Facebook posts, that they considered her political beliefs, or used those things as a basis to demote her. That evidence just isn't there. To find that it might be there would be speculation. And we're at summary judgment. So we're at a phase where speculation, allegations have to give way to the facts and the evidence. And so the District Court did properly apply Monell here, because there is no evidence that HHS, through its Board, took an action that announced an official policy that was unconstitutional. The U.S. Supreme Court and this Court in Monell, in all the cases that we cited in our brief, acknowledged that this is not a general statute of liability. It is, admittedly, relatively narrow because responding at superior does not apply. So courts need to be careful that when it applies Monell, it's not doing so in such a way that the municipality is being held responsible for something that it didn't officially do. So we believe the dismissal of the 1983 claim should be affirmed. I will touch on the other two claims, although I think this case at base is a First Amendment case. Race discrimination. This case is not and never has been about Dr. Costillo's race. I think it was raised earlier during my opponent's argument that not once did Dr. Costillo's race come up during the months-long path that led to her demotion. She didn't raise it. Nobody else raised it. The only time that race came up in the course of this record, in all the depositions and everything, was when HHS's own counsel asked their own clients, did Dr. Costillo's race play any role here? And the answer was resoundingly, no. Counsel, I'd like to go back to the First Amendment claim again, if I could, and specifically the issue of whether they've raised a genuine dispute of material fact that would preclude summary judgment. So in the memo that was given to the board, the shorter version, they twice refer to Costillo's leadership as pertaining to a safe work environment and to an atmosphere for people of color. It basically calls her a racist. Why couldn't a jury look at that memo and look at the corresponding language in the memo to the MEC, referencing her and the job requirements, and also her Facebook posts, and conclude that there was ratification by the board for the MEC's action? I'm not understanding why that's not raising an issue of fact, given that you've got all these memos, you've got the language in the second one basically accusing her of being a racist, and in the first memo references to her Facebook posts. Why is that not a fact issue for the jury? A couple of pieces there, Your Honor. First of all, I don't think she was called a racist in here. The statement was made that people of color in her department, in fact, were not comfortable raising issues with her, but it wasn't just people of color. I mean, it was 13 out of 14 physicians in the department said, we don't want to work for you anymore. So I don't think it's reasonable to, with all due respect, I don't think she's being called a racist in here. With respect to ratification, the law is clear, and we set out all the cases in our brief, that ratification doesn't require, well, it's two things. Not just that the final policymaker approved a decision. That happened here. We're all on the same page there. But there's the second prong that says the final policymaker, when they approve the act, have to know. There's a knowing element. They have to know that what they're approving is an unconstitutional act. In this, in the context of this case, there would have to be some evidence that the board, at least one of them, if not all 13, knew that, hey, I'm basing this on this vote on Dr. Gustafson. Kennedy's sixth deposition testimony is not evidence. It is evidence. It just doesn't create a fact dispute here. Because, like I said, when you look at the context of what Dr. Hilden said, he said, the board approved the basis for the next vote, and you look to my memo, Dr. Hilden's memo, for the bases. And with all due respect, a reasonable juror reading this would not conclude that the board was approving an unconstitutional act. These are, the most reasonable inference to draw from this memo is that the board was approving the demotion of a leader who had lost all confidence in her department and who is not meeting several pieces of her job description. That's what's laid out here. So we do not believe the district court got this wrong and that this court should affirm on the basis that there is not sufficient evidence to proceed to trial on a Monell claim. So I'm going to circle back to the race discrimination claim here. I think I touched on the fact that this really isn't a race claim. Dr. Castillo claimed that she was being, quote, canceled for her political views. That's in the record. Political view discrimination is not protected by Title VII or by the Minnesota Human Rights Act. That's a First Amendment claim, and we've been talking about that already here and the reasons why that claim does not prevail. What's your best case for that proposition? I'm sorry? What's your best case for that proposition, that Title VII doesn't include political beliefs discrimination? Well, sure. Thank you, Your Honor. First of all, I'd look at the statute itself. Title VII, the Minnesota Human Rights Act, lists all the protected classes. That's what the statute says. Yes. I'm talking about appellate cases. Sure, sure. I mean, this is a unusual proposition, but it's not totally off out of in another universe. Sure. So I believe, and I'd have to refer back to my brief and the district court's order. We did cite some cases where other courts have held that when you're basing a claim on your political beliefs and you feel like you've been discriminated based on political I don't remember circuit court sites. Are there any? It's not coming off the top of my mind, but I'd have to defer to my brief. And I guess I'll just say, we don't dispute that in another world, there could be a claim where someone says, I was stereotyped based on my race, and in this case, based on a particular political view that people thought I should hold because I'm a person of color. What we're arguing is the facts and evidence here don't support that claim. There's no evidence in the record that anyone at HHS prescribed a particular political belief to Dr. Gosillo or any other person for that matter. There's even one MEC member who testified in the record that he himself has similar leanings, more conservative leanings, and yet when asked in the deposition, why did you still vote to demote her, he said, a leader without followers can't lead. This was about leadership. It was not about her race. What about the evidence that prior to this time she was basically sort of a poster doctor for the health system and was promoted in advertising and then later when her views didn't conform to those of the system that it all changed? Your Honor, with respect, we would say that the reason why she was demoted is because of her change in leadership and the behaviors that she was doing in the workplace. It wasn't because her views changed. Well, I was referring to the stereotype situation where a person of color is promoted in terms of, gosh, look at our great diversity, but then when it was found out that she didn't hold certain views, that all changed. I don't think the evidence proves that here or even creates a fact issue of that here, Your Honor. If in a different world the facts did show that, again, we're not disputing the concept of the legal claim. We're here on summary judgment. We have over a year of discovery. We have lots of documents in the record, and there's no evidence that HHS took any of the actions that it did because she didn't conform to the particular views that she's claiming here. They were based on legitimate leadership failures that the record is replete with them. In all of the discussion she was having in the workplace during this period in 2020, it was very much my way or the highway. She was shutting down other people's views. People didn't feel like they could bring concerns to their supervisor. Judge Erickson mentioned the, you know, pressuring people to give up their income. Well, she herself didn't take a pay cut. These were things that really rubbed people the wrong way. She herself admitted in her, I think it's in the e-mails, that she's a bit of a bull in a china shop. Those are her words, that she was pushing. She admitted she was defensive and that she, I think in one e-mail, said I was the, quote, knightess of the conflict. Well, that's a medical term that means she was the source of the conflict. These are her words. She is acknowledging that she's being too harsh, basically, and people didn't like that. And we see that. That's undisputed. Thirteen out of 14 people said I've had enough. It's time for a leadership change. So those are legitimate non-discriminatory reasons to take the action that was taken. There's no evidence of race discrimination here. I've got just a few seconds left here. I'm going to defer to our briefs on the retaliation claim. I think the briefs adequately cover that, unless Your Honors have any questions on that one or any other claim. All right. Well, thank you very much for your time. We respectfully request the affirmance of the district court's order and dismissal of all claims. Thank you. Thank you, Your Honors. I'll be very brief. Make it a minute here. So as to the last point, discussion of race in COVID was ubiquitous at HHS in 2020, as one would expect, and Dr. Hilden acknowledged that discussions of race were germane to the mission of HHS. The problem with Dr. Gastilla was the content of her speech on those subjects. Everyone else was talking about it as well. It was a disagreement about her views that she expressed. Turning back to the issue of Monell liability, I think counsel may have misspoke in stating that the standard requires the Board of Governors to know that they're doing an unconstitutional act. I don't believe that is a standard. The standard is one strictly of ratification, and the basis for the decision, which was acknowledged in the 30B6 testimony of Dr. Hilden, and as Judge Grass also pointed out, the memo itself refers to her treatment of people of color as an issue that would link back to the MEC memo. And with that, Your Honors, I'd be happy to take any questions. Thank you, Your Honor. Thank you. Thank you, counsel. The case has been well briefed and argued, and we'll take it under advisement.